IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CRIMSON YACHTS, etc., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. 08-0334-WS-C |
| | ) |
| M/Y BETTY LYN II, etc., et al., | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

This matter is before the Court on the motion of defendant Blyn II Holding, LLC ("Blyn") to vacate the arrest of defendant M/Y Betty Lyn II ("Betty Lyn") and to dismiss the in rem claims against her. (Doc. 23). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 24, 28, 37), and they presented additional evidence at the hearing conducted on the motion. After carefully considering the foregoing and other relevant material in the file, the Court concludes that the motion to vacate arrest is due to be granted.

**BACKGROUND**

The plaintiff, which owns a ship repair yard, entered a contract with Blyn to perform certain repairs on the Betty Lyn. She was placed under cover in the shipyard, and work began on approximately October 1, 2006. Blyn timely paid all invoices until that of March 26, 2008. The amount of unpaid invoices exceeds $600,000, which the plaintiff claims along with a 10% retainage on all work done to date. The Betty Lyn remains in the shipyard, with a good bit of work completed and a good bit more not accomplished.

**DISCUSSION**

"[A] person providing necessaries to a vessel on the order of the owner or a person

authorized by the owner ... has a maritime lien on the vessel." 46 U.S.C. § 31342(a). The term "necessaries" includes repairs. *Id*. § 31301(4). The plaintiff claims such a lien. (Doc. 1 at 1).

In order for a maritime lien to attach under Section 31342, the repairs must have been rendered to "a vessel." Blyn argues that the Betty Lyn was not a "vessel" at the relevant time and that, consequently, the plaintiff can have no maritime lien. Absent a maritime lien, it concludes, arrest of the Betty Lyn was improper and must be vacated. (Doc. 23 at 1-2, 9). *See Board of Commissioners v. M/V Belle of Orleans*, 535 F.3d 1299, 1314 (11th Cir. 2008) ("The lien and the proceeding in rem are, therefore, correlative — where one exists, the other can be taken, and not otherwise.") (internal quotes omitted); *Industria Nacional Del Papel, C.A. v. M/V Albert F*, 730 F.2d 622, 625 (11th Cir. 1984) ("A court obtains in rem jurisdiction over a vessel when a maritime lien attaches to the vessel."). Blyn accepts that it bears the burden of persuasion. (Transcript at 4).

"The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. Section 3 "suppl[ies] the default definition of 'vessel' throughout the U.S. Code, unless the context indicates otherwise." *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 490 (2005) (internal quotes omitted) (applying Section 3 to the Longshore and Harbor Workers' Compensation Act ("LHWCA")). As the parties do not suggest that the context of Section 31342 indicates that some other definition of "vessel" applies, the Court utilizes that of Section 3. *See also Miami River Boat Yard, Inc. v. 60' Houseboat*, 390 F.2d 596, 597 (5th Cir. 1968) (applying Section 3 to the question whether there was a vessel for purposes of 46 U.S.C. § 971, the predecessor of Section 31342); *Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621, 623 (5th Cir. 1955) (same).

"Under § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Stewart*, 543 U.S. at 497. "The question remains in all cases whether the

watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id*. at 496. For example, "ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again." *Id.* at 494. The Betty Lyn was not taken permanently out of the water and so is not captured by this portion of *Stewart*. The Court must look further to determine if she remained practically capable of water transportation while under repair.

Jones Act and LHWCA cases require that the vessel be "in navigation."[1] This does not mean that a "vessel" under Section 3 might nevertheless not be a "vessel in navigation" under these statutes. Rather, the "in navigation" inquiry is "relevant to whether the craft is 'used, or capable of being used' for maritime transportation" as required by Section 3, because it recognizes that "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time." *Stewart*, 543 U.S. at 496. That is, "the 'in navigation' requirement is an element of the vessel status of a watercraft." *Id.*[2] Because being "in navigation" is an element of vessel status, if a watercraft is not "in navigation," it is not practically capable of being used as a means of transportation on water and so is not a "vessel" for purposes of Section 3. The Court therefore turns to cases considering when a vessel placed under repair ceases to be

---

[1]Even though the relevant section of the Jones Act does not employ the term, "vessel," Section 3 provides the definition of the term for purposes of determining who is a "seaman" under the Act. *Stewart*, 543 U.S. at 488-89 & 489 n.1 ("seaman" status under the Jones Act is measured by the LHWCA exception for "a master or member of a crew of any vessel"); *id*. at 494 ("Applying § 3 brings within the purview of the Jones Act the sorts of watercraft considered vessels at the time Congress passed the Act.").

[2]To emphasize that being in navigation is a sine qua non of vessel status, *Stewart* cited an "in navigation" case for the proposition that the question whether a craft is practically capable of use for water transportation may involve fact issues for the jury. *Id*. (citing *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995)).

in navigation.[3]

"A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is ... berthed for minor repairs ...." *Stewart*, 543 U.S. at 494. "At some point, however, repairs become sufficiently significant that the vessel can no longer be considered in navigation." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 374 (1995).[4] "The general rule among the Courts of Appeals is that vessels undergoing repairs or spending a relatively short period of time in drydock are still considered to be 'in navigation' whereas ships being transformed through 'major' overhauls or renovations are not." *Id*. "Obviously, while the distinction at issue here is one of degree, the prevailing view is that 'major renovations can take a ship out of navigation, even though its use before and after the work will be the same.'" *Id*. (quoting *McKinley v. All Alaskan Seafoods, Inc*., 980 F.2d 567, 570 (9th Cir. 1992)). As the *McKinley* Court noted, "[m]ajor overhaul or refitting of a vessel will take the vessel out of navigation." 980 F.2d at 570 (citing *West*

---

[3]Blyn characterizes the Betty Lyn as a "dead ship." (Doc. 23 at 2, 9). A "dead ship" has been described as "a ship withdrawn from navigation and marine commerce" and no longer a "vessel." *Amoco Oil v. M/V Montclair*, 766 F.2d 473, 477 (11th Cir. 1985). While the term has occasionally been applied to ships that leave the water only for the purpose of repair, *see Delome v. Union Barge Line Co.*, 444 F.2d 225, 232 (5th Cir. 1971), it is more commonly associated with ships laid up indefinitely and with no likelihood of a prompt return to service, as with a mothball fleet. *See, e.g., Croley v. Matson Navigation Co.*, 434 F.2d 73, 74 (5th Cir. 1970); *see generally Mullane v. Chambers*, 333 F.3d 322, 328 (1st Cir. 2003) (under the dead ship doctrine, "a ship loses its status as a vessel when its function is so changed that it has no further navigation function"; "[s]imply taking a vessel temporarily out of service ... does not render it a dead ship"). The Court finds the "dead ship" terminology unhelpful and potentially problematic in the repair context presented here and employs neither the phrase nor any test for determining "dead ship" status.

[4]*Stewart* cited *Chandris* as a case basing the "in navigation" requirement on the recognition that a vessel can lose its character as such if removed from the water for an extended time. 543 U.S. at 496. *Stewart* carries no hint that *Chandris*' test for applying the "in navigation" requirement to repair situations is no longer the correct one under Section 3, and the plaintiff makes no argument to the contrary.

*v. United States*, 361 U.S. 118 (1959)).

Precedent within this Circuit is consistent with these principles. Thus, whether repairs take a vessel out of navigation depends on "the extent of the repair operations and on who controls those operations." *Waganer v. Sea-Land Service, Inc.*, 486 F.2d 955, 958 (5th Cir. 1973) (internal quotes omitted). The extent of the repair operations focuses on "whether the contracted work is minor or major," with major work including such things as "structural changes, alterations in the hull, [and] major overhauling." *Id*. Thus, where the vessel's "engines, generators, boilers and pumps were dismantled," power had been cut off, her crew was gone, and she could be moved only by tug, the vessel "was undergoing a major overhaul" and the trial court properly found she was not in navigation. *Erwin v. Lykes Brothers Steamship Co.*, 472 F.2d 1217, 1219 (5th Cir. 1973). Likewise, where the vessel "underwent an extensive overhaul" that included "both structural changes and regular maintenance," costing over $600,000 and lasting 77 days, the trial court properly ruled as a matter of law that the vessel was not in navigation. *Hodges v. S.S. Tillie Lykes*, 512 F.2d 1279, 1280 (5th Cir. 1975).

Under these authorities, there is no question but that the Betty Lyn was not in navigation, and thus was not a "vessel" under Section 3, at any relevant time.

The Betty Lyn is a 132-foot yacht built in 1974 and thus 32 years old when the work at issue began. Before being towed to the plaintiff's shipyard, her engines and much of her equipment were removed. The scope of the work undertaken by the plaintiff included at least the following:

- Removing all remaining machinery, equipment, furnishings, electronics, wiring, plumbing, windows and doors, stripping the craft bare
- Replacing the existing three engines with two more powerful engines
- Sealing the center shaft rendered unnecessary by the two new engines, making it part of the hull
- Creating two new shaft lines or tunnels to accommodate the two new

engines, which required cutting through the hull
- Recessing the propeller into the bottom of the hull
- Cutting through the hull to install port and starboard stabilizers
- Adding a skeg/keelson along the external center line
- Putting a newer bottom on the hull
- Extending the fuel tank on the transom
- Replacing the two generators
- Modifying a forward engine room bulkhead
- Removing and reinstalling joiner bulkheads
- Extending the sun decks
- Installing teak decking on all exterior decks
- Replacing teak cap rail
- Raising the wheelhouse one foot
- Replacing the AC, refrigeration and ventilation systems
- Replacing the windlass, ground tackle, rudders and all running gear
- Replacing the sea valves and all associated plumbing
- Replacing all electronics and navigational equipment, including GPS, radar, fathometers, radios, depth sounders, and navigational lights
- Replacing all life rafts, emergency position indicating radio beacon, signaling gear, and firefighting equipment
- Replacing tender and crane/davit system
- Replacing all electrical wiring, panels and associated systems
- Replacing all plumbing, pumps and sanitation systems
- Replacing all doors, windows and portholes
- Replacing all interior furnishings, soft goods and appliances
- Removing all paint and completely fairing, below and above the waterline

(Goff Affidavit at 2; Short Affidavit at 6-7; Transcript at 23, 30, 33, 50, 57-58, 62, 67).[5]

In the face of this exhausting yet non-exhaustive listing, it can scarcely be argued that the scope of work does not reflect "major work" sufficient to take the Betty Lyn out of navigation. Indeed, the plaintiff's president admitted that the work constituted a "major overhaul," "major refurbishment," "major outfitting," and "major rehabilitation." (Transcript at 72). The Court agrees and so finds.

The plaintiff is not aided by a consideration of who controlled the repair operation. As a threshold matter, there is some question as to whether this is a legitimate consideration when, as here, the issue is not whether the owner owes a duty to furnish a seaworthy vessel or to exercise reasonable care. This appears to be the primary if not sole context in which matters of control are addressed in the caselaw. Moreover, in *Chandris* the Court indicated that the scope of the work alone can remove a vessel from navigation as a matter of law. 515 U.S. at 375; *see also McKinley*, 980 F.2d at 571 (at least when the repairs are so extensive as to constitute a conversion, the vessel is not in navigation even though the owner controls the repairs).

At any rate, the Court finds that Blyn was not in control of the repair operation. The plaintiff stresses that Blyn maintained an on-site representative during the project, who was at the shipyard throughout most weekdays and was regularly consulted by the plaintiff's management concerning matters of price, change orders, and "things [that] come up" during a refit. (Short Affidavit at 7-8; Transcript at 65). It is hardly surprising that the owners of a vessel undergoing several millions of dollars of work pursuant to a major overhaul would keep a representative on site to protect their interests, but this routine and prudent step does not show that the owners controlled the repair operation. *See, e.g., United States v. West*, 361 U.S. 118, 119-20 (1959) (ship representatives who

---

[5]Blyn's witness testified that the work called for the hull to be extended seven feet. (*Id.* at 50). The plaintiff's president denied this. (*Id.* at 57). For present purposes, the Court finds that extending the hull was not part of the work.

remained on board as inspectors of the work "had no control of the ship in the ordinarily accepted context") (internal quotes omitted); *Hodges*, 512 F.2d at 1280 (where vessel representatives remained aboard to watch the ship and provide access but had no supervisory power over the workers, the owner did not control the operations); *Johnson v. Oil Transport Co.*, 440 F.2d 109, 113 (5th Cir.1971) (owner's representative, whose function was to order or authorize various items of repairs and to approve the work upon completion, was not in control of the repairs). Because the unexpected does occur on large remodeling projects (ask any homeowner), the owner must be consulted about how to proceed, and it must approve alterations in the price or scope of work required by new circumstances or the owner's change of mind. That this is accomplished by one on-site (and thus in the best position to appreciate the situation and respond on the owner's behalf), rather than by telephone calls to and from a distant state, can be of no moment.

In summary, the Court finds that the Betty Lyn, who was undergoing major repairs not controlled by her owners, was not in navigation.[6]

The plaintiff makes several attempts to neutralize this finding. Without acknowledging *Stewart*, it first argues that a vessel need not be "in navigation" in order to satisfy Section 3. (Doc. 28 at 13). As discussed above, *Stewart* makes clear that the "in navigation" requirement "is an element of vessel status" under Section 3. 543 U.S. at 496. The plaintiff's reliance on *Pleason* for its argument is unexplained and apparently unfounded. It is true that *Pleason*, in discussing Section 3, did not advert to an "in navigation" element, but neither did it deny the existence of such a requirement. Even if *Pleason* could be read as the plaintiff wishes, it could not survive *Stewart*'s express description of being "in navigation" as "an element" of vessel status under Section 3.

The plaintiff next cites *Stewart* for the proposition that "being 'lodged in a drydock

---

[6]Because the Court does not rely on the challenged portions of his affidavit in making this finding, the plaintiff's motion to strike portions of the affidavit of Alan D. Goff, (Doc. 30), is **denied as moot**.

or shipyard' does not change a vessel's identity [as a vessel] — as long as it can 'again be put to sea.'" (Doc. 28 at 15 (quoting *Stewart*, 543 U.S. at 496)). While *Stewart* did acknowledge the obvious — that "[a] ship long lodged in a drydock or shipyard can again be put to sea" — it did not state or suggest that, this being the case, such a ship never loses vessel status under Section 3. On the contrary, the very next sentence of *Stewart* states, "[t]he question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id*. The answer to that question depends on whether, given the scope of repairs (and, perhaps, who controlled them), the vessel remains "in navigation" while in drydock or shipyard.

The plaintiff also complains that distinguishing ordinary repair from major renovations is an exercise so fraught with difficulty as to be impossible to perform. (Doc. 28 at 13-14). Whatever its imprecision, this is the test that the Supreme Court in *Stewart* and *Chandris*, and the Eleventh Circuit in *Waganer*, *Erwin* and *Hodges*, have adopted, and it is not given to the plaintiff, or this Court, to ignore it because it violates some aesthetic or other sensibility. Nor, as discussed above, is its application to the facts of this case at all ambiguous.

As a corollary, the plaintiff questions a test under which a ship loses vessel status "at some magic undefined moment during the progress of the work." (Doc. 28 at 14-15). The Court has been presented with no authority for the unlikely proposition that a vessel undergoing major repairs in a shipyard remains in navigation until some threshold quantity of work is completed.[7] If the work is major as defined above, the vessel leaves

---

[7]Although unnoted by the plaintiff, the Court is aware of a line of cases indicating that a "dead ship" may assume vessel status at the commencement, not the conclusion, of repairs to ready her for a return to service. *See Colonna's Shipyard, Inc. v. U.S.A.F. General Hoyt S. Vandenberg*, 584 F. Supp. 2d 862, 871-72 (E.D. Va. 2008) (collecting cases). That cannot be so in the Eleventh Circuit, where major repairs take a vessel out of navigation, not into it.

navigation no later than when the repairs commence.[8]

The plaintiff next suggests that, although the work on the Betty Lyn ended up as a major overhaul, it didn't start out that way and became a major overhaul only by the accretion of 37 change orders. (Transcript at 71-72). The evidence will not support that proposition. The change orders added $1.6 million to the total cost of the project, which was an increase of 35% above the original price. (*Id*. at 61-62). That means the original cost of the project was over $4.5 million, and the plaintiff has not offered to explain how such a huge project could avoid constituting a major repair job.[9] Moreover, even as originally envisioned, the work was anticipated to take 15 months, (Short Affidavit at 3), which of itself indicates major repair. *See Chandris*, 515 U.S. at 374-75 (while six months "is a relatively short period of time for important repairs on oceangoing vessels," the 17 months involved in *McKinley* is not). But the clincher is the plaintiff's admission that, from the outset, the work was "to completely overhaul and refurbish" the Betty Lyn. (Short Affidavit at 2). The Court finds that the work constituted a major overhaul from the first.[10]

The plaintiff presents a number of appellate cases concluding under various

---

[8]That the Betty Lyn was towed to the shipyard and thus was in navigation at that point does not, contrary to the plaintiff's insistence, (Doc. 28 at 14), establish or even suggest that she remained in navigation once repairs began.

[9]The Betty Lyn is subject to a preferred ship mortgage of $6 million, (Short Affidavit at 5), and the original project cost exceeds 75% of that amount.

[10]Even had the plaintiff established that the job only evolved into a major overhaul, it would still lose. The plaintiff admits that Blyn paid all invoices from 2006 all the way until March 2008. (Short Affidavit at 5). By that time, most if not all of the change orders had been made, and the project was a major overhaul even by the plaintiff's standards. A maritime lien "subsist[s] from the moment the debt arises." *Dresdner Bank AG v. M/V Olympia Voyager*, 465 F.3d 1267, 1272 (11th Cir. 2006) (internal quotes omitted). Because the debt which the plaintiff seeks to secure arose after even it admits a major overhaul existed, the Betty Lyn was out of navigation and no maritime lien could arise to secure that debt.

circumstances that a vessel existed. (Doc. 28 at 4-10). None of them, however, addressed the status of a ship while undergoing repairs,[11] and so none impacts the analysis set forth above.

Finally, the plaintiff finds it critical that the Betty Lyn would not sink were it given 24 hours to make her watertight. (Doc. 28 at 16).[12] Although the majority of the evidence presented at the hearing was directed to the parties' respective positions on this point, no case brought to the Court's attention indicates in the slightest that whether a ship under repair is practically capable of water transportation is to be determined in such a fashion. On the contrary, *Stewart* made clear that it rejects any "'snapshot' test." 543 U.S. at 495. As discussed above, whether a ship under repair has lost its status as a Section 3 vessel turns on whether it remains "in navigation" during the repairs, and that question is answered by the scope of the repairs, not by whether at some point during them the ship would or would not sink if placed in water.

## CONCLUSION

For the reasons set forth above, the Court finds that the Betty Lyn was not in

---

[11] The Belle of Orleans underwent repairs after Hurricane Katrina, but the question presented was her status prior to the repair, when she was tied along the Louisiana shore. 535 F.3d at 1312. The plaintiff in *Pleason* asserted a maritime lien for repair services, but the Court addressed vessel status only before and after the repairs, not during them. 221 F.2d at 623. The houseboat in *Miami River Boat Yard* underwent repair (while resting in the water), but the opinion addresses only its status before, and perhaps after, the repairs. 390 F.2d at 597. The vessel in *M/V Marifax v. McCrory*, 391 F.2d 909 (5th Cir. 1968), underwent repair, but the Court considered only whether its immediately preceding 15-year "desuetude" prevented it from being a vessel. *Id.* In *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht*, 625 F.2d 44 (5th Cir. 1980), the Court stated only that it knew of no authority for the proposition that placing a new vessel in dry storage for three months deprives it of vessel status. *Id.* at 47 n.2.

[12] Blyn finds it equally important that she would sink if put in the water in her present condition. (Doc. 37 at 2).

navigation and thus was not a vessel against which a maritime lien could arise. Accordingly, Blyn's motion to vacate arrest and to dismiss the in rem claims against the Betty Lyn is **granted**. The in rem claims against the Betty Lyn alleged in the First Cause of Action of the complaint are **dismissed**. The arrest of the Betty Lyn is **vacated**, and the plaintiff's appointment as substitute custodian is rescinded.

DONE and ORDERED this 26th day of February, 2009.

s/ WILLIAM H. STEELE<br>
UNITED STATES DISTRICT JUDGE